IN THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF UTAH

| | |
|---|---|
| THORNE RESEARCH, INC. and SOFTGEL FORMULATORS, INC.,<br><br>       Plaintiffs,<br><br>vs.<br><br>XYMOGEN, INC.,<br><br>       Defendant. | MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTIONS FOR NEW TRIAL, DENYING DEFENDANT'S MOTION TO STRIKE AND MOTION FOR ATTORNEY'S FEES, AND GRANTING PLAINTIFFS' MOTION TO ALTER JUDGMENT<br><br>CASE NO. 2:13-CV-784 TS<br>Judge Ted Stewart |

This matter is before the Court on motions from both parties. Plaintiffs filed three motions for new trial (collectively, the "New Trial Motions") and a Motion to Alter Judgment. Defendant filed a Motion to Strike Plaintiffs' Motions for New Trial for Failure to Comply with Page Limitations and a Motion for Attorney Fees. For the following reasons, the Court will deny the New Trial Motions and Defendant's Motions. However, the Court will grant Plaintiffs' Motion to Alter Judgment.

## I.      BACKGROUND

Softgel Formulators, Inc. owns United States Patent No. 8,491,888, titled "Highly Absorbable Coenzyme Q10 Composition and Method of Producing Same" (the "'888 patent"). The patent was exclusively licensed to Thorne Research, Inc. ("Thorne") by Softgel Formulators on August 1, 2011. The patent issued on July 23, 2013, and on August 22, 2013, Thorne and Softgel Formulators (collectively, "Thorne") filed this lawsuit against Xymogen for infringement of the '888 patent.

On February 20, 2018, following a six-day trial, the jury found that Xymogen's accused products did not infringe claim 1 or claim 5 of the '888 patent, and that both claims were invalid

due to derivation and improper inventorship. Thorne now seeks a new trial based on: (1) the Court's rulings and instruction on the "non-crystalline" limitation; (2) insufficiency of the evidence to support derivation and noninfringement; and (3) inconsistency of the jury's verdict. Thorne also seeks to have the Judgment amended to state that claims 1 and 5 are invalid, rather than stating that the entire patent is invalid. In response, Xymogen filed a Motion to Strike the New Trial Motions for failure to comply with the page limitations set out in DUCivR 7-1(a)(3)(C). Xymogen is also seeking attorney's fees under 35 U.S.C. § 285.

## II.    DISCUSSION

### A. *Xymogen's Motion to Strike*

DUCivR 7-1(a)(3)(C) provides that a motion for new trial, "must not exceed 2,500 words, or in the alternative, ten (10) pages." "Exceptions are rarely granted and only upon a showing of good cause."[1] "When there is no federal rule pertaining to a particular subject or issue, federal judges may regulate the practice of law in their courts 'in any manner consistent with federal law . . . and local rules of the district.'"[2] "No sanction or other disadvantage may be imposed for noncompliance with any requirement not in federal law, federal rules, or the local rules unless the alleged violator has been furnished in the particular case with actual notice of the requirement."[3]

According to Xymogen, Thorne attempted to skirt the Court's page limitation by filing three motions for new trial. Xymogen argues that the New Trial Motions are brought under the

---

[1] Senior Judge Ted Stewart, *Practices and Procedures*, http://www.utd.uscourts.gov/senior-judge-ted-stewart.

[2] *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1112 (10th Cir. 2007) (quoting Fed. R. Civ. P. 83(b)).

[3] Fed. R. Civ. P. 83(b).

same rules and the issues substantially overlap, so Thorne should have filed one motion and either adhered to the page-limitation rule or sought leave to file an overlength motion.

Thorne argues, however, that the New Trial Motions were filed separately "in order to maintain conceptual clarity" as "[e]ach motion presents conceptually distinct legal and factual matters, and provides a separate and independent basis for a new trial."[4] "Furthermore, nothing in the Federal Rules of Civil Procedure or this Court's Local Rules limits motions brought under Rule 59 to a single motion, or provides a basis to strike plaintiff's motions."[5]

First, there is no rule that states that a party may not file multiple motions for new trial under Rule 59. Second, while there is overlap between the motions, each one deals with a distinct issue for which a new trial may be granted. Finally, granting Xymogen's Motion would result in Thorne's inability to condense and re-file the New Trial Motions because a motion for a new trial "'must be filed no later than 28 days after the entry of judgment,' and a district court is not permitted to extend this deadline."[6] Therefore, in the absence of a rule disallowing multiple Rule 59 motions, and in the interest of justice, the Court denies Xymogen's Motion to Strike.

B. *The New Trial Motions*

Under Federal Rule of Civil Procedure 59(a)(1)(A), "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." "The decision to grant a motion

---

[4] Docket No. 438, at 1.

[5] *Id.* at 4. "Further, in contrast to the lack of any local rule addressing or imposing any limits relating to Rule 59, this Court's Local Rules on Rule 56 specifically state[] that 'the parties should endeavor to address **summary judgment** issues in a single motion.'" *Id.* at 5 (quoting DUCivR 56-1(b)(1)).

[6] *Payne v. Turley*, 567 F. App'x 573, 575 (10th Cir. 2014) (quoting Fed. R. Civ. P. 59(b)) (internal citations omitted).

for new trial is committed to the trial court's sound discretion."[7] "[A] new trial may be granted if the district court concludes the 'claimed error substantially and adversely' affected the party's rights."[8]

"Although a trial judge has broad discretion to order a new trial, the court should also 'respect the collective wisdom of the jury' and 'in most cases the judge should accept the finding of the jury, regardless of his own doubts in the matter.'"[9] "After giving the jury's findings full respect, the judge should grant a new trial only if 'the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"[10]

1. The Court's *Daubert* Ruling and Curative Instruction

The Court construed "non-crystalline" as "no CoQ10 crystals visible by light microscope at magnifications of 640X."[11] Two years later, and less than two months before trial, Thorne argued for the first time that the term "light microscope" referred only to the use of a method of light microscopy known as bright field illumination. Thorne made this argument in an effort to exclude the portions of Dr. Prestwich's testimony in which he testified that his use of polarized light revealed crystals in the accused products.

---

[7] *Hardman v. AutoZone, Inc.*, 214 F. App'x 758, 762 (10th Cir. 2007); *see Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*, 602 F.3d 1325, 1331 (Fed. Cir. 2010) ("We review the denial of a motion for judgment as a matter of law or for a new trial under the law of the regional circuit.").

[8] *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1217 (10th Cir. 2008) (quoting *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1297 (10th Cir. 1998)).

[9] *Jensen v. W. Jordan City*, No. 2:12-CV-736-DAK, 2017 WL 4620983, at *12 (D. Utah Oct. 13, 2017) (quoting *Landes Const. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1371 (9th Cir. 1987)).

[10] *Id.* (quoting *Landes Const. Co.*, 833 F.2d at 1372).

[11] Docket No. 106, at 9.

After a full review of the claim-construction briefing and the '888 patent, the Court found "no statements, definitions, or arguments limiting the use of a light microscope to one specific technique or type of light microscopy," and, therefore, concluded "that claim construction is not limited to one type of light microscopy and the use of both bright field illumination and polarized light microscopy comply with claim construction."[12] "If Thorne wanted the Court to construe 'Non-Crystalline' as limited to bright field illumination, it should have argued for the limitation before the Court's ruling on claim construction."[13] Instead, Thorne argued that "Non-Crystalline" should be construed as, "lacking crystals visible by light microscope at magnifications of 640x,"[14] a construction nearly identical to the one adopted by the Court. The Court also warned the parties against arguing or eliciting testimony on claim construction at trial and stated that it would "be the jury's role to decide how much weight to afford the use of the different techniques."[15]

Despite this warning, Dr. Brothers testified that he understood polarized light microscopy to be outside of the Court's claim construction. Due to the misleading nature of this testimony, the Court gave the following curative instruction:

> You heard testimony from Dr. Brothers implying that the use of polarized light microscopy . . . is outside of the scope of the court's claim construction of the term non-crystalline. The court's construction of non-crystalline does not limit the use of a light microscope to one technique of light microscopy. The use of both bright field illumination and polarized light microscopy comply with claim construction.[16]

---

[12] Docket No. 267, at 3.

[13] *Id.* at 4.

[14] Docket No. 54, at 4.

[15] Docket No. 267, at 10.

[16] Docket No. 412, at 5 n.1.

Thorne now seeks a new trial on the issue of infringement, arguing that "multiple errors were made regarding the Court's construction of the term 'non-crystalline,' including with respect to rulings on the *Daubert* motions and a 'curative' instruction during trial which confused the jury and further prejudiced Plaintiffs."[17]

    a. The *Daubert* Order

Thorne argues that the Court's Order on the parties' motions to exclude parts of Dr. Brother's and Dr. Prestwich's expert testimonies (the "*Daubert* Order"),[18] was incorrect because it "improperly expanded the scope of the claim construction to include a modality—polarizing filters—for which there was no intrinsic evidence, and which was contrary to the method employed by one of skill in the relevant art," and "it placed the jury in the position of determining which modality complied with the claim construction."[19]

Thorne also argues that "the Court's holding in that regard was based upon Xymogen's incorrect argument to the Court that the standard to be applied in determining whether one 'skilled in the art' would have used polarizing filters is one skilled 'in the art of light microscopy.'"[20] According to Thorne, "the correct standard to be applied was whether one skilled in the art of manufacturing CoQ10 supplements would have used such a filter,"[21] and "[t]he evidence of record demonstrated ***only*** that those of skill in the art of manufacturing CoQ10

---

[17] *Id.* at 2.

[18] Docket No. 267.

[19] Docket No. 412, at 2.

[20] *Id.* at 4.

[21] *Id.*

supplements—Thomas Rumolo (via William Judy) and Don Steele—used light microscopes with no polarizing filter."[22]

Xymogen argues that Thorne is merely rehashing its arguments from the *Daubert* Order briefing despite the Court's rejection of those arguments. "The Court's claim construction ruling and subsequent clarifying order are supported by the intrinsic evidence, and should not be disturbed merely because Thorne regrets failing to have argued for a different construction during the claim construction process."[23]

The Court rejects Thorne's arguments. First, the scope of claim construction was not expanded by the *Daubert* Order. As with any category that contains sub-categories, the scope of light microscopy was not expanded by the Court's finding that two methods, or "sub-categories," of light microscopy fit within the definition. The scope of claim construction would only be expanded if the original construction specifically limited light microscopy to one method and then the Court allowed for a second method to be used. That is not the case here. Thorne failed to mention any method of light microscopy until their attempt to exclude Dr. Prestwich's testimony two months before trial, so no limitation was ever placed on "light microscopy."

Second, Thorne misunderstands the *Daubert* Order if it thinks that the Court based its findings on the argument that a person having ordinary skill in the art ("PHOSITA") of light microscopy is the standard by which to determine whether a polarizing filter fell within claim construction. As the Court plainly stated, "[c]laim terms are generally given their ordinary and accustomed meaning as understood by one of ordinary skill in the art,"[24] and in construing "non-

---

[22] *Id.* at 9 (internal citations omitted).

[23] Docket No. 429, at 2.

[24] Docket No. 106, at 3; *see Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

crystalline," the Court considered how a PHOSITA of manufacturing CoQ10 supplements would understand the term. However, in addressing the admissibility of expert testimony, as was required in Thorne's attempt to exclude Dr. Prestwich's testimony, the standard is based on Federal Rule of Evidence 702. The Court was not revisiting claim construction two months before trial in its *Daubert* Order, but was considering whether the two methods were valid techniques of light microscopy and whether Dr. Prestwich and Dr. Brothers were qualified to testify as experts in those techniques.

Further, Thorne provided no evidence that a PHOSITA of manufacturing CoQ10 supplements would only use bright field illumination, thereby warranting exclusion of Dr. Prestwich's testimony and a re-visiting of the Court's construal of "non-crystalline." Thorne alleged that the inventor of the patented products only used bright field illumination, but provided no further evidence supporting this, and there is no special definition clearly stated in the patent specification or file history that a polarized filter cannot or should not be used.[25]

Despite these findings, Thorne argues that the *Daubert* Order and curative instruction were made in error because Donald Steele and Thomas Rumolo, both PHOSITAs of manufacturing CoQ10 supplements, testified in favor of Thorne's construction at trial. According to Thorne, "Mr. Steele confirmed that, when creating the formulations that resulted in the '888 patent, he looked through a microscope to determine whether crystals were present."[26] "Thomas Rumolo, similarly testified that, after he formulated his CoQ10 composition, he sent

---

[25] "'[A] patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history.' Absent such a statement, 'words in a claim are generally given their ordinary and customary meaning'" Docket No. 267, at 5 (quoting *Vitronics Corp.*, 90 F.3d at 1582).

[26] Docket No. 412, at 5.

the formula to William Judy who 'looked under the microscope' to determine if CoQ10 crystals were present."[27]

These statements from Mr. Rumolo and Mr. Steele, however, say nothing of the method of light microscopy used. They state that a microscope was used, but no further detail was elicited from them. Regardless, even if they specified the type of light microscopy used, they did not state that polarized light microscopy could not be used. And while that testimony may not have been appropriate in front of the jury, as it would be arguing claim construction, both parties had access to these witnesses long before trial.

Further, evidence that a PHOSITA in manufacturing CoQ10 supplements would understand light microscopy as being limited to bright field illumination was not, and has not been provided to the Court. On the contrary, one of Thorne's earlier experts, Kent Rader, submitted an expert report on behalf of Eurofins Scientific Inc., Supplement Analysis Center in which Eurofins analyzed the accused products using a "light microscope with a polarizing filter."[28] Finally, Dr. Prestwich stated that he has experience working with "biomaterials, pharmaceuticals, agrochemicals, cosmetics, and nutritional supplements companies," and not only understands "the term 'light microscope' to include a microscope that utilizes any form of visible light as the source of illumination," but used a polarizing filter in his examination of the accused products.[29]

For these reasons, the Court finds that the *Daubert* Order was correct in stating that bright field illumination and polarized light microscopy are both methods of light microscopy that comply with claim construction.

---

[27] *Id.*

[28] *See* Docket No. 182-1, at 1–3.

[29] *See* Docket No. 255-12, ¶¶ 2–3.

b. Indefiniteness

Thorne argues for the first time that the Court's construction of "non-crystalline" "would allow virtually any microscopic technique to be used," and is thus invalid due to its indefiniteness.[30]

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."[31] "The definiteness requirement . . . mandates clarity, while recognizing that absolute precision is unattainable."[32]

Thorne argues that, with no limit to the methods of light microscopy that may be used under claim construction, "there would be no certainty whatsoever, and a potential infringer presumably must exhaust all of those techniques to determine whether it was infringing or not, as would a patentee."[33]

While the Court did not limit light microscopy to a specific method, the claim construction is not indefinite. First, Thorne has not provided evidence that a PHOSITA in the manufacturing of CoQ10 supplements could not determine whether a product was within the scope of the claims.

Second, a PHOSITA in the manufacturing of CoQ10 supplements knows that the product must not contain CoQ10 crystals that are visible under a light microscope at 640X magnification. This PHOSITA, therefore, knows exactly what type of crystal he is looking for, the magnification to consider, and the type of microscope to use. This PHOSITA would also know

---

[30] Docket No. 412, at 8.

[31] *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014).

[32] *Id.* at 2129.

[33] Docket No. 412, at 8.

the specific characteristics and qualities of CoQ10 crystals, including the color, whether the crystals are birefringent, and what the crystals look like under a microscope. He would, therefore, know the different methods of light microscopy that would be best for determining whether CoQ10 crystals are visible at the specified magnification, and it would be unnecessary for him to go through every single method of light microscopy in his search.

Finally, Thorne argues that "[t]here is no reason Plaintiffs should have been tasked with excluding every possible light microscopy technique during claim construction, nor should they have been expected to foresee what technique Xymogen may have employed to avoid a finding of infringement."[34]

No party should be tasked with excluding everything that a definition at claim construction may cover. However, if a PHOSITA of manufacturing CoQ10 supplements would understand "light microscopy" as referring to only one method, then it was Thorne's duty to make the argument for that limitation during claim construction. Thorne did not. Instead, Thorne argued that the Court should construe non-crystalline as "lacking crystals visible by light microscope at magnifications of 640X," a definition that was less specific than the patent specification and was too ambiguous as it did not specify the type of crystals which must be lacking in the product. For these reasons, the Court finds that the original claim construction is not invalid due to indefiniteness.

### c. The Curative Instruction

The Tenth Circuit has produced conflicting precedent regarding the standard for granting a new trial due to an erroneous instruction.[35] In some cases, the Tenth Circuit has "require[d]

---

[34] Docket No. 452, at 5.

[35] *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1233 (10th Cir. 2000). Regional circuit law is used to determine whether an erroneous instruction warrants a new trial. *Wordtech Sys., Inc. v.*

reversal when a jury might have based its decision on an erroneous instruction, even if that possibility was very unlikely."[36] However, an earlier case held that a new trial should be granted "when it is more likely than not that the erroneous instruction affected a substantial right of the appellant."[37] The Court finds that a new trial is not warranted under either standard.

Thorne argues that the errors in the *Daubert* Order were "compounded when Xymogen sought to elicit testimony from Dr. Brothers regarding the use of polarized light," and the Court gave a curative instruction which "made it very clear that the scope of the construction had changed, prejudicing Plaintiffs and creating juror confusion."[38]

As previously stated, the scope of claim construction was not changed by the *Daubert* Order. The curative statement was only necessary because Thorne's expert, Dr. Brothers, did exactly what Thorne sought to keep Dr. Prestwich from doing when Dr. Brothers made misleading statements regarding the scope of claim construction. With the clarification that both methods of light microscopy fit within claim construction, the jury was able to properly weigh the strengths and weaknesses of the two methods presented by the parties as they sought to determine "whether further testing with the use of polarized light would have made Dr. Brothers' tests more reliable."[39] Therefore, the Court finds that the instruction was not erroneous. Instead, it was necessary in order to cure any confusion caused by Thorne's witness.

---

*Integrated Network Sols., Inc.*, 609 F.3d 1308, 1314 (Fed. Cir. 2010) ("For issues not unique to patent law, we review jury instructions under the law of the relevant regional circuit.").

[36] *Koch*, 203 F.3d at 1233; *see Coleman v. B-G Maint. Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1202 (10th Cir. 1997); *City of Wichita, Kan. v. U.S. Gypsum Co.*, 72 F.3d 1491, 1495 (10th Cir. 1996).

[37] *Koch*, 203 F.3d at 1233; *see U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1252 n.39 (10th Cir. 1988).

[38] Docket No. 412, at 2.

[39] Docket No. 429, at 8.

For these reasons, the Court finds that a new trial is not warranted as a result of the *Daubert* Order or the issuance of the curative instruction. Therefore, the Court denies this Motion.

2. Insufficiency of the Evidence

Thorne's second motion for new trial asserts that the evidence presented at trial was insufficient for the jury to find invalidity due to derivation under 35 U.S.C. § 102(f) because Xymogen failed "to prove by clear and convincing evidence that Thomas Rumolo conceived of every element of Claims 1 and 5 of the '888 patent as construed by the Court."[40] Xymogen argues that "even if the Court were to accept Thorne's argument regarding the jury's finding of derivation, a new trial would not be warranted because the patent remains invalid under the jury's finding of improper inventorship."[41] However, the procedure following a finding of improper inventorship is different, as Thorne would be given an opportunity to correct the inventorship. Therefore, the Court will consider whether there was sufficient evidence for the jury to find invalidity due to derivation.

"A 'motion for a new trial on the ground that the verdict of the jury is against the weight of the evidence is normally one of fact and not of law and is addressed to the discretion of the trial court."[42] The moving party "bear[s] the heavy burden of demonstrating that the verdict was clearly, decidedly, or overwhelmingly against the weight of the evidence."[43] But absent a result "so excessive or inadequate as to shock the judicial conscience and to raise an irresistible

---

[40] Docket No. 407, at 2.

[41] Docket No. 432, at 2.

[42] *Blanke v. Alexander*, 152 F.3d 1224, 1235 (10th Cir. 1998) (quoting *Campbell v. Bartlett*, 975 F.2d 1569, 1577 (10th Cir. 1992)).

[43] *Id.* at 1236 (internal quotation marks omitted).

inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the fact is considered inviolate."[44]

Invalidity based on the "claim that a patentee derived an invention addresses originality . . . [and] asserts that the patentee did not 'invent' the subject matter of the count because the patentee derived the invention from another."[45] "To show derivation, the party asserting invalidity must prove both prior conception of the invention by another and communication of that conception to the patentee."[46] The Court will address conception first.

"Conception is the formation 'in the mind of the inventor of a definite and permanent idea of the complete and operative invention, as it is therefore to be applied in practice.'"[47] It "must encompass all limitations of the claimed invention, and 'is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation.'"[48] "Actual reduction to practice requires that the claimed invention work for its intended purposes, and . . . constructive reduction to practice occurs when a patent application on the claimed invention is filed."[49]

Thorne argues that "[t]here is no record evidence from which a rational juror could have concluded that Mr. Rumolo conceived of: (1) a non-crystalline CoQ10 composition, meaning no

---

[44] *Id.* (internal quotation marks omitted).

[45] *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993); 35 U.S.C. 102(f) ("A person shall be entitled to a patent unless: he did not himself invent the subject matter sought to be patented.").

[46] *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1576 (Fed. Cir. 1997).

[47] *Singh v. Brake*, 317 F.3d 1334, 1340 (Fed. Cir. 2003) (quoting *Kridl v. McCormick*, 105 F.3d 1446, 1449 (Fed. Cir. 1997)).

[48] *Id.* (quoting *Burroughs Wellcome Co. v. Barr Labs. Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994)) (internal citations omitted).

[49] *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986) (internal citations omitted).

CoQ10 crystals visible by light microscope at magnifications of 640x; and (2) a carrier oil."[50] According to Thorne, Xymogen represented that the accused products had crystals, and "Mr. Rumolo testified on direct examination that he created a formula that was stable, crystal free and highly absorbable," but "did not testify, that his formula . . . lacked CoQ10 crystals under a light microscope at 640x."[51] Thorne also quotes Dr. Prestwich's testimony in which he testified that samples from Mr. Rumolo's first production lot contained crystals. Finally, Thorne quotes the following exchange between Thorne's counsel and Mr. Rumolo: "And so you don't contend that you created a formula where there are no crystals visible by light microscope at magnification of 640, do you? A: No."[52]

Xymogen argues that "Thorne incorrectly suggests that because Mr. Rumolo [reduced to practice one embodiment] of his invention that showed crystals under a light microscope, he could not have [conceived] of a 'Non-Crystalline' CoQ10 formulation."[53] "Mr. Rumolo testified that when he reduced to practice one embodiment of his invention—by mixing the physical formula that he recorded as T-7-53D—and allowed Dr. Judy to examine it by light microscope, this examination revealed some crystals. But this does not mean that Mr. Rumolo did not conceive of a "Non-Crystalline" formulation, as that term has been construed by the Court."[54]

The Court finds that there was evidence presented at trial from which the jury could find that Mr. Rumolo conceived of the patented formula. First, Dr. Judy's original examination of the product that came from Mr. Rumolo's formula was conducted prior to claim construction, so the

---

[50] Docket No. 407, at 2.

[51] *Id.* at 5 (internal citations and quotation marks omitted).

[52] Docket No. 455, at 3 (quoting Trial Tr. at 748:3–18).

[53] Docket No. 432, at 2.

[54] *Id.* at 6.

statement that the examination revealed crystals was made without the limitations that the patent or claim construction set on the term "non-crystalline."

Second, the jury was provided with the following testimony from Mr. Rumolo:

> Q. Did you eventually create a CoQ10 formula that was stable, crystal [free] and highly absorbable?
> A. I did.
> …
> A. Our CoQ10 and NVC's formula was roughly 7 percent of the total weight of the dosage. That lies between 5.3 and 12 percent meeting their requirement. Yes, indeed, we do have a solvent, which is Clarinol A80 and Capmul. The Clarinol Alpha-80 is conjugated linoleic acid or CLA that's listed in Claim 1. And we do have avocado oil in there. I'd rather call it an absorption facilitator, but I can understand what they're trying to convey there as a carrier oil. So, yes, it is.
> Q. Okay. . . . Now here we put up Claim 5, which is what we call a dependent claim follows on Claim 1. Did you invent in your formula T-7-53-D the conjugated linoleic acid?
> A. Yes.
> Q. And what is that in your formula?
> A. Clarinol Alpha-80.[55]

According to the evidence presented at trial, Dr. Judy and Mr. Steele then took this formula and reduced it to practice.

Finally, while Mr. Rumolo's testimony alone is not enough to prove conception,[56] there was sufficient corroborating evidence presented at trial, including: (1) Mr. Rumolo's laboratory notebook with the "winner" formula in it; (2) correspondence from Mr. Rumolo to Dr. Judy and to National Vitamin Company employees detailing the ingredients and amounts in Mr. Rumolo's formula (evidence that also goes to the communication prong of derivation); (3) the results of a blood study report in which Dr. Judy analyzed the results of absorption studies performed using Mr. Rumolo's formulas; and (4) correspondence between Mr. Rumolo and management at National Vitamin Company regarding the filing of their own patent. From this evidence, a jury

---

[55] *Id.* at 4 (quoting Trial Tr. at 705:24–706:5; 729:3–730:2).

[56] *Price*, 988 F.2d at 1194.

could find that Mr. Rumolo conceived of the formula that was used to create the "non-crystalline" product patented by Dr. Judy and Mr. Steele.

The evidence presented at trial also supports the argument that the formula contained avocado oil that functioned as a "carrier oil." There was disagreement regarding the scientifically correct description of how avocado oil functions in the intestines, but Thorne itself elicited testimony from Mr. Rumolo that what he called an "absorption facilitator" was the equivalent of a "carrier oil."[57] There was also testimony from Thorne's expert, Dr. Abato, stating that avocado oil acts as a carrier oil.

> However, Thorne argues that Xymogen cannot
>
> rely upon the testimony from Plaintiffs' expert, Dr. Abato. If that were the case, then the jury's verdict is inherently insupportable because the testimony adduced by Plaintiffs indicated that the Accused Products were both non-crystalline and contained a carrier oil, and the jury could not simultaneously accept that testimony and find that those Accused Products, which were the same as the Rumolo formulation, were non-infringing.[58]

This argument, while best addressed in conjunction with Thorne's third new trial motion, ignores the fact that the jury could have relied on some of Dr. Abato's testimony, that avocado oil acted as a "carrier oil," but not other testimony.

Therefore, the Court finds that that there was sufficient evidence presented at trial for the jury to find that Mr. Rumolo conceived of the original formula Dr. Judy and Mr. Steele later reduced to practice in the '888 patent.

Regarding the communication requirement in the test for derivation, "[t]he communication must be sufficient to enable one of ordinary skill in the art to make the patented

---

[57] "A. We called it that, yes. Fat facilitator, absorption facilitator, yes. Q. And I believe you sort of acknowledge it's a type of carrier oil that appeared to be intended in the '888 patent? A. I understood what they were trying to get at. But, yes, in that line. Yes." Docket No. 432, at 8 (quoting Trial Tr. at 747:10–21).

[58] Docket No. 455, at 6.

invention."[59] At trial, the jury was presented with multiple emails between Mr. Rumolo and Dr. Judy in which Mr. Rumolo conveyed his formula to Dr. Judy and they discussed the results from the absorportion studies Dr. Judy and his team performed on products created from Mr. Rumolo's formula. Dr. Judy and Mr. Steele were also in communication, and the two of them could have used the formula, as communicated by Mr. Rumolo, to make the patented invention. Therefore, the evidence at trial was sufficient for the jury to find communication of the conceived formula. With evidence showing conception and communication, the Court finds that there was sufficient evidence for a jury to find invalidity due to derivation.

Next, Thorne argues that a new trial is warranted because the jury's verdict of noninfringement is not supported by the evidence at trial. According to Thorne, "Dr. Prestwich testified that the Accused Products contained crystals visible by microscope examination with a polarizing filter; however, he offered no testimony whatsoever to demonstrate that those were [CoQ10 crystals], as required by the claim construction."[60]

The jury was asked in the verdict form whether Xymogen had infringed claim 1 or claim 5 and the jury found that neither had been infringed. It was Thorne's burden to prove infringement by a preponderance of the evidence and they failed to meet that burden.[61] Xymogen did not have to put on any evidence on this issue. Even if they did, Dr. Prestwich specifically addressed the type of crystals in the accused products in his testimony:

> Q. Okay. Before we move onto that, these crystals that we have been seeing, are those CoQ10 crystals or are they something else?
> A. Those are CoQ10 crystals.

---

[59] *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1344 (Fed. Cir. 2003).

[60] Docket No. 407, at 11.

[61] *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1301 (Fed. Cir. 2011) ("To prove infringement, the plaintiff bears the burden of proof to show the presence of every element or its equivalent in the accused device.").

Q. How do you know that?
A. Because they -- there is no other component in the softgel capsule contents that is crystalline. There is the CLA, the conjugated linoleic acid, there are oils, and there are medium-chain di- or triglycerides, monoglycerides, that are co-solvents. None of those have any crystalline form. So the only crystal, the only thing that could be there as a crystal is CoQ10.[62]

For these reasons, the Court finds that Thorne's arguments regarding insufficiency of the evidence in support of the jury's findings of noninfringement fail. Therefore, the Court denies Thorne's Motion for New Trial Based on Insufficiency of the Evidence.

3. Inconsistent Verdicts

In its third motion, Thorne seeks a new trial on infringement and invalidity due to derivation under Federal Rule of Civil Procedure 49(b)(4), asserting that the jury's findings on those claims are "fundamentally and irreconcilably inconsistent."[63] According to Thorne, the jury could not have found that "the Accused Products did not include one or more elements of Claims 1 and 5 of the '888 Patent . . . while at the same time finding that . . . Thomas Rumolo[] conceived of every element of Claims 1 and 5 . . . ."[64]

This Motion stems from the final day of trial in which Xymogen allegedly invited inconsistency in the verdict during its closing argument by stating:

Tom Rumolo may have invented what he called a crystal-free formulation, but it wasn't until we walked into court here that we got a specific definition of what noncrystalline in the patent means, and that's this line at 640x. And it's those crystals that Dr. Prestwich sees that makes it a non-infringing product.[65]

---

[62] Trial Tr. at 644:2–13.

[63] Docket No. 409, at 1.

[64] *Id.* at 1–2.

[65] *Id.* at 10 (quoting Trial Tr. at 918:23–919:8).

Thorne moved for a curative instruction, arguing that the instruction was necessary because Xymogen's closing statements suggested to the jury that they could "consider Mr. Rumolo a joint or co-inventor even if he did not conceive of the 'non-crystalline' limitation . . . ."[66]

The Court declined to give the instruction, finding that Xymogen's remarks were not misleading as they clarified that Mr. Rumolo's statement regarding a "crystal-free" formula was made before the Court construed the meaning of "non-crystalline." The Court also stated that "the jury has been deliberating for several hours at this point. To now hand them an additional jury instruction would be prejudicial as they may be inclined to give that instruction undue weight."[67]

When the jury returned the Verdict, Thorne believed that the verdict was flawed and, before the jury was discharged, requested "that the Court immediately order the jury to further deliberate and consider its answers and verdict, or to order a new trial pursuant to Fed.R.Civ.P. 49(b)(4)."[68] The Court declined to do so, but indicated that Thorne could submit its objections post-trial. Thorne has now filed those objections.

A verdict form which asks the jury to only answer questions of fact is normally considered a special verdict form under Rule 49(a).[69] However, when those questions of fact

---

[66] Docket No. 370, at 2. Thorne requested the following instruction: "In determining Softgel's claim of patent infringement and XYMOGEN's claim of patent invalidity, you are instructed that you are required to apply the terms of claims 1 and 5 of the '888 as construed by the Court in both instances." *Id.*

[67] Docket No. 372, at 2.

[68] Docket No. 409, at 11.

[69] "Simply put, a general verdict permits the jury to decide who wins. A special verdict, by contrast, presents the jury with specific questions of fact. After the jury returns its verdict, the court applies the law to the facts found by the jury and enters judgment accordingly." *Johnson v. Ablt Trucking Co., Inc.*, 412 F.3d 1138, 1142 (10th Cir. 2005) (holding that a verdict form requiring the jury to answer specific questions of fact regarding fault and damages was a special verdict form) (internal citations and quotation marks omitted).

involve issues such as patent infringement and invalidity due to derivation,[70] it is impossible for the jury to make a finding without legal instruction from the Court, and the verdict form asking for a finding on such issues should be considered a general verdict form.[71] Therefore, the verdict form in this case is a general verdict form despite being entitled "Special Verdict Form."

When a general verdict form's "answers are inconsistent with each other and one or more is also inconsistent with the general verdict, judgment must not be entered; instead, the court must direct the jury to further consider its answers and verdict, or must order a new trial."[72] While the general verdict form used in this case did not contain interrogatories or questions that were separate from the ultimate finding on each issue, the Court may still consider any possible inconsistencies in those findings under Rule 49(b)(4).[73]

---

[70] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996) (holding that infringement is a question of fact); *Price*, 988 F.2d at 1190 ("While the ultimate question of whether a patentee derived an invention from another is one of fact, the determination of whether there was a prior conception is a question of law which is based upon subsidiary factual findings.") (internal citations omitted).

[71] *See Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310 (Fed. Cir. 2013) ("It would be impossible for lay juries to determine whether a claim is anticipated or infringed without some legal instruction, as evidenced by our ample case law addressing the correctness of jury instructions. Although the jury was technically finding only 'facts,' we hold that the verdict is a general verdict because like the questions in *Railroad Dynamics,* the questions on anticipation and validity require legal instruction, the application of legal principles, and are more than simply written findings upon each issue of fact. Indeed, the questions are so general that they do not bring the jury process into the open so that all can see what has been done as expected in a special verdict, which is what makes reviewing a general verdict for consistency so difficult.") (internal citations and quotation marks omitted).

[72] Fed. R. Civ. P. 49(b)(4).

[73] *See Function Media, L.L.C.*, 708 F.3d at 1329–30 ("The jury's responses were not special verdicts, because they were not simply 'written finding[s] upon each issue of fact.' Rule 49(a), Fed.R.Civ.P. Nor was there a single general verdict, *per se*, accompanied by 'written answers' to 'one or more issues of fact the decision of which is necessary to a verdict.' Rule 49(b) Fed.R.Civ.P. Nonetheless, as above indicated, the parties have correctly viewed the jury's ten responses as the equal of a general verdict . . . .").

Under this Rule, "[a] verdict is irreconcilably inconsistent only when the essential controlling findings are in conflict, the jury has failed utterly to perform its function of determining the facts, and its verdict is a nullity."[74] "A jury's verdict may not be overturned merely because the reviewing court finds the jury's resolution of different questions in the case difficult, though not impossible, to square."[75] However, while the Court must accept any "plausible theory that supports the verdict," it cannot "invade the province of the jury by disregarding factual findings."[76]

Thorne argues that, "if Claims 1 and 5 were derived from Rumolo, then Rumolo's invention by necessity also infringes those same claims. But if his formulation does not infringe Claims 1 and 5, those claims cannot be derived from him."[77] Xymogen first argues that this Motion is rendered moot because Thorne does not challenge the jury's finding of invalidity on the basis of improper inventorship and thus, even if the derivation finding was inconsistent, claims 1 and 5 are still invalid. However, not only does the Federal Circuit "stress the useful general rule that trial courts should decide all litigated issues, in the interest of finality,"[78] but invalidity due to improper inventorship alone allows the patentee an opportunity to remedy the

---

[74] *Johnson*, 412 F.3d at 1144 ("For example, a verdict that finds (1) no negligence by the defendant and (2) that the defendant's negligence caused the plaintiff's injuries, is facially inconsistent and cannot form the basis of a judgment.") (internal quotation marks omitted). "Because the issue of inconsistent jury findings is a procedural matter not unique to patent law[,] we apply the discernable law of the forum." *Arachnid, Inc. v. Medalist Mktg. Corp.*, 972 F.2d 1300, 1304 (Fed. Cir. 1992) (internal quotation marks omitted).

[75] *Johnson*, 412 F.3d at 1144.

[76] *Braun v. Medtronic Sofamor Danek, Inc.*, 719 F. App'x 782, 792 (10th Cir. 2017) (internal citations and quotation marks omitted).

[77] Docket No. 409, at 9.

[78] *Multiform Desiccants, Inc. v. Mezam, Ltd.*, 133 F.3d 1473, 1481 (Fed. Cir. 1998).

invalidity finding. Therefore, the Court will address the present Motion to bring finality and to determine whether the procedure for curing invalidity due to improper inventorship is necessary.

In addressing the merits of the Motion, Xymogen argues that Thorne's "entire motion is based on a single factual flaw: [that the Accused Products and Mr. Rumolo's formula are identical.]"[79] Thorne counters that, "Xymogen took the position before trial that Mr. Rumolo's formulation Formula D was not the same as that of the Accused Products," and agrees that "[i]f, in fact, there had been evidence adduced at trial in that regard, then potentially the verdict could have been sustainable."[80] However, Thorne maintains that this was not the case, and that Xymogen failed to adduce any evidence at trial showing any difference between the National Vitamin HiSorb product, sold as CoQMAX, and Rumolo's Formula D. Thorne argues that "Mr. Mahoney . . . confirmed that: (1) Xymogen sought and obtained rights to distribute the National Vitamin HiSorb formula, which it then sold, without alteration, under its CoQMAX™ trademark; and (2) HiSorb was in fact Formula D-7-53D; Rumolo's formulation, upon which Xymogen's claim of derivation was based."[81]

Xymogen points out that Mr. Rumolo's formula, the Accused Product labels, and the NVC Master Formula documents contain different amounts and percentages of ingredients. Xymogen also notes that the jury did not make specific findings on whether the formula and the accused products were identical, and argues that "Thorne relies solely on speculation by Mr. Mahoney and attorney argument about the composition of the products."[82]

---

[79] Docket No. 436, at 2.

[80] Docket No. 409, at 9.

[81] *Id.*

[82] Docket No. 436, at 5.

Thorne contends, however, that the "[t]he only difference in the ingredients is that the Accused Products have two additional ingredients,"[83] and "one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device."[84]

Despite conflicting testimony and arguments as to whether the ingredients in the accused products and Mr. Rumolo's formula are identical, it is not the Court's role at this stage to weigh the evidence. With no finding from the jury as to whether the accused products and Rumolo's formula were identical, and with argument and evidence at trial in support of Xymogen's theory that the accused products are not the same as Rumolo's formula, the Court finds that Xymogen's theory is plausible. With that theory, the jury's findings of invalidity due to derivation and non-infringement are reconciled, and the Court denies Thorne's Motion.

C. *Motion to Alter/Amend Judgment*

The Verdict Form asked the jury to find whether any claim of the '888 patent was invalid due to derivation and, in a separate question, whether any claim was invalid due to improper inventorship.[85] Following each question, the jury was asked to state which claim or claims were invalid by making a mark next to claim 1 and/or claim 5. After finding both claims 1 and 5 invalid under both theories, Judgment was entered, stating, "the '888 patent is invalid."[86] Thorne now requests that the Judgment be amended to state "that claims 1 and 5 of the '888 patent are invalid," as opposed to stating that the entire patent is invalid.[87]

---

[83] Docket No. 458, at 5.

[84] *Id.* at 6 (quoting *Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1178 (Fed. Cir. 1991)).

[85] *See* Docket No. 380, at 2.

[86] Docket No. 381, at 1.

[87] Docket No. 413, at 3.

The purpose of a motion to alter or amend a judgment under Rule 59(e) "is to correct manifest errors of law or to present newly discovered evidence."[88] "Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice."[89] "Thus, a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law."[90] "It is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing."[91]

Xymogen argues that the entire patent is invalid, despite the jury only considering the validity of claims 1 and 5, as the remaining claims either depend on the now invalid claims or are interrelated and, therefore, invalid as a matter of law. Thorne, however, argues that "[t]he other claims retain the presumption of validity imposed by statute because Xymogen did not seek to prove that they were invalid, nor prove to the jury's satisfaction that they were invalid."[92]

It is true that Xymogen only sought to prove the invalidity of claims 1 and 5 of the '888 patent. That is what Xymogen stated in the Pretrial Order,[93] that is what Xymogen argued for at trial, and those were the only two claims the jury was asked to consider when determining invalidity. Therefore, in order for the judgment to remain consistent with the jury's findings, and

---

[88] *Webber v. Mefford*, 43 F.3d 1340, 1345 (10th Cir. 1994) (internal quotation marks omitted); *see also Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir. 1997) ("A Rule 59(e) motion to alter or amend the judgment should be granted only to correct manifest errors of law or to present newly discovered evidence.") (internal quotation marks omitted).

[89] *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

[90] *Id.*

[91] *Id.*

[92] Docket No. 459, at 3. "A patent shall be presumed valid; that presumption attaches to each claim independently of the other claims." *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984).

[93] *See* Docket No. 250, at 3.

in an effort to not go beyond the jury's verdict,[94] the Court grants Thorne's Motion, and the

Judgment will be amended to state that "claims 1 and 5 of the '888 patent are invalid."

D. *Motion for Attorney's Fees*

Xymogen seeks attorney's fees totaling $2,231,234.35, alleging that Thorne knew as

early as November 21, 2014, that the accused products did not infringe the '888 patent and that

the '888 patent was invalid, but continued to litigate in bad faith, entitling Xymogen to recover

attorney's fees under 35 U.S.C. § 285.

"Section 285 demands a simple discretionary inquiry; it imposes no specific evidentiary

burden,"[95] providing only that "[t]he court in exceptional cases may award reasonable attorney's

fees to the prevailing party."[96] "[A]n 'exceptional' case is simply one that stands out from others

with respect to the substantive strength of a party's litigating position (considering both the

governing law and the facts of the case) or the unreasonable manner in which the case was

litigated."[97]

"District courts may determine whether a case is 'exceptional' in the case-by-case

exercise of their discretion, considering the totality of the circumstances."[98] "'[T]here is no

precise rule or formula for making these determinations . . . .'"[99] However,

---

[94] *Banke of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) ("A motion for reconsideration performs a valuable function where 'the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties . . . .'") (quoting *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983)).

[95] *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S.Ct. 1749, 1758 (2014) ("Under the standard announced today, a district court may award fees in the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees.").

[96] 35 U.S.C. § 285.

[97] *Octane Fitness, LLC*, 134 S.Ct. at 1756.

[98] *Id.*

[a] case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award. Other non-exclusive factors that may support a finding of exceptional case include frivolousness, motivation, objective unreasonableness of a case's factual or legal components, and the need in particular circumstances to advance considerations of compensation and deterrence.[100]

Regarding motivation, "motivation to harass or burden an opponent may be relevant to an 'exceptional case' finding[, but] motivation to implement the statutory patent right by bringing suit based on a reasonable belief in infringement is not an improper motive."[101] Finally, "[d]efeat of a litigation position . . . does not warrant an automatic finding that the suit was objectively baseless; all of the circumstances must be considered."[102]

Xymogen concedes that "Thorne could conceivably have had a plausible basis for believing it could succeed on the merits when it first filed suit in August of 2013," but alleges that over the course of litigation "it became increasingly obvious that no reasonable litigant could expect success on the merits."[103]

In response, Thorne details the evidence it produced at trial, arguing that they had reason to expect success on the merits of the case. Specifically, Thorne refers to the documents produced by Xymogen's supplier stating the makeup of the accused products, the expert testimony from Dr. Brothers and Dr. Abato that the accused products infringed claims 1 and 5, and the evidence supporting the argument that Mr. Steele and Dr. Judy conceived of the patented formula.

---

[99] *Id.* (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994)).

[100] *Univ. of Utah v. Max-Planck-Gesellschaft zur Foerderung der Wissenschaften e.V.*, 851 F.3d 1317, 1322 (Fed. Cir. 2017) (internal citations and quotation marks omitted).

[101] *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 858 F.3d 1371, 1375 (Fed. Cir. 2017) (internal citations and quotation marks omitted).

[102] *Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1315 (Fed. Cir. 2010).

[103] Docket No. 396, at 2.

The Court finds that, even at the close of trial, with all of the evidence before the jury, there was a reasonable possibility of success for either side. This is partially evidenced by the Court's denial of Xymogen's Rule 50(a) motion, in which the Court found

> that Plaintiffs provided sufficient evidence for a reasonable jury to find that Defendant infringed both claim 1 and claim 5 of the '888 patent. First, Dr. Ed Brothers testified that he examined the accused products under a light microscope at 640X magnification and was unable to see anything that he could definitively state was a CoQ10 crystal. This satisfies the crystal free or, "non-crystalline requirement."
>
> Regarding other ingredients in the accused products, Dr. Abato testified that CoQ10 was present in a weight of approximately 6.89%, which fell within the range provided by claim 1. He also testified that conjugated linoleic acid ("CLA") was used as a solvent in the accused products, and the accused products contained avocado oil which acted as a carrier oil.[104]

Thorne also proffered evidence of a plausible theory opposing Xymogen's invalidity claims. And while the evidence at various points during trial may have favored one side or the other, there was no uncontroverted evidence or inevitable outcome that would lead the Court to find Thorne's efforts unreasonable and, therefore, consider this case to be exceptional.

Regarding evidence of Thorne litigation in bad faith, Xymogen argues that Dr. "Brothers revealed that Thorne's counsel explicitly instructed him not to use the scientific standard of polarized light microscopy to examine the Accused Products."[105] Thorne also allegedly knew it could not win at trial if Dr. Prestwich testified and thus sought to exclude his testimony "by narrowing the Court's claim construction *ex post facto*."[106] Finally, Xymogen alleges that the

---

[104] Docket No. 383, at 3.

[105] "Q. Why did you not use a polarizing filter as part of your analysis of the samples that you were provided in this case? A. Because, as I understood it, that was not part of the scope of the instructions for examining these samples. Q. The instructions you were given? A. Yes. Q. By counsel? A. Yes." Docket No. 396, at 9.

[106] *Id.*

only purpose of this lawsuit was to stamp out competition and was largely based on Thorne's President's animosity toward Xymogen as his former employer.

These arguments lack sufficient support for the Court to find that Thorne acted in bad faith. First, even if Dr. Brothers was instructed to only use bright field illumination, bright field illumination is a valid technique used in light microscopy, and the decision to use one technique over the other does not demonstrate bad faith. Second, the determination that bright field and polarized light could be used had not been made until after Thorne's Motion to exclude parts of Dr. Prestwich's testimony, and Thorne had the right to make the Motion. There is also no evidence that Thorne's only motivation was to stamp out competition or that the past five years of litigation in this suit were based on animosity toward a former employer. Xymogen itself said that "Thorne could conceivably have had a plausible basis for believing it could succeed on the merits when it first filed suit in August of 2013 . . . ."[107]

Finally, as in all cases, both sides made mistakes, but neither side's actions demonstrated bad faith or rose to a level that would make this case exceptional under the statute or in light of the actions of the opposing party. Therefore, the Court finds that attorney's fees are not warranted under § 285.

### III.    CONCLUSION

It is therefore

ORDERED that Plaintiffs' New Trial Motions (Docket Nos. 404, 406, and 410) are DENIED;

ORDERED that Defendant's Motion to Strike (Docket No. 415) and Motion for Attorney's Fees (Docket No. 396) are DENIED; and

---

[107] *Id.* at 2.

ORDERED that Plaintiffs' Motion to Alter Judgment (Docket No. 413) is GRANTED. The Judgment will be amended to state, "IT IS ORDERED AND ADJUDGED that Defendant's accused products are not infringing claims 1 and 5 of the '888 patent, and claims 1 and 5 of the '888 patent are invalid."

DATED this 29th day of May, 2018.

BY THE COURT:

_____

Judge Ted Stewart